Case numbers 23-1535 and 24-1335. David Little v. City of Saginaw, MI et al. Four arguments not to exceed 15 minutes per side. Mr. Chubb, you may proceed for the appellate. Good morning, judges. Always an honor to be before you. Anthony Chubb on behalf of officers Stephen Lautner and Jordan LaDuce. This is a qualified immunity appeal. I'm reserving three minutes for rebuttal. So we obviously have a limited amount of time. I want to get right to the details. I know you're well aware of the facts, but very briefly just to refresh the court. No need on the facts. Excellent. Then what I want to proceed to then is... In fact, why don't we go with a few facts that are a little odd. You know, the whole footprint, boot, snow, right, that makes some sense. It's a little odd that you can't even see the boot. You never even see the tread. So it's not even clear what that's revealing in terms of probable cause or anything. But on top of that, the individual is identified as African-American and the person who answers the door is white. You're going to focus on shoe size? Well, let's kind of separate those things out because it was only the investigation that later determined that the individual was African-American and that's when the charges were dismissed. And that was after he was released from jail after a slight time when he bonded out. So at the time, there were 911 calls that are in the record that indicate that the individual was Caucasian and that was what Officer LaDuce and Officer Lautner were responding to. I thought the original 911 call mentioned the suspect as African-American and I thought one of the officers testified to the fact that they might have known of this call. Is that an inaccurate reading of the record? I think that's an inaccurate reading of the record only as to timing. I know they ultimately So you think that the record suggests that at the time they went to his house, they did not know about the comment of the race of the individual? That is absolutely my understanding Do you think they did? Or if there's a dispute of fact on this, do you think it blows up your case because it would obviously refute probable cause? I think that the record amply shows probable cause when we look at what happened where my officers are initially responding to a 911 call of MDOC, malicious destruction of property. They show up, they see the broken the individual was pushing a bike. They followed them directly to Mr. Lautner's house. I'm sorry, to the plaintiff's house, Mr. Little. And independent of a 911 call, I think that this can likewise establish probable cause. And so the tracks in the snow were fresh. It's very clear on their body cam that they are following them directly to his door. They knocked on his door. And six seconds after they go in, they arrest him. And we can't argue about facts in this. The district court said that. You can't revisit that here. And so that's the point in time at which we're assessing whether they had probable cause. Is that accurate? That is correct, yes. Of course, what you will see is that from the body cams, again, I think it's very clear that there is an implied consent by gesture where... Where's that from? This is really far afield from what we do on QI. This is an interlocutory appeal. The district court did not determine that those were relevant. I mean, those were actual facts that we would take into consideration here. So my question is, it seems to me as to the arrest, and I think you were just talking about the entry, that the only facts the officers know on this record for purposes of whether they had probable cause to arrest the man six seconds after they walk in his home is that these footprints and this, you know, bicycle track lead to his home. Am I overlooking anything? Well, when you reference the six seconds, he was placed in handcuffs at that time. That usually means you're under arrest. It's quite a seizure, right? But they did subsequently compare the shoes that they found... Okay, I'm not asking about subsequently. I'm asking about at the time that they lead to his home. At the time that the handcuffs are placed on him, that is accurate. Okay. And I mean, what is it exactly that confirms this later as to the tread? Because the tread doesn't match in all kinds of ways. And the record seems to suggest that the shoes were just in the officer's car, sort of, you know, they didn't do much with them afterward. I think that it's inaccurate. And I think that that's inaccurate insofar as what I've seen on the police reports, the comparison of the tracks to the tracks in the snow to the shoes that they found drying against a box fan were very similar. And the court... It says they were wet. Yeah, that's all you're saying. They were wet. They'd been I'm sorry, I'm saying that the tracks were similar and that the officers did have pictures that are in the record. They're in the police report, which was attached to my original motion for summary in the district court. And additionally, there is testimony by Stephen Lautner, Officer Lautner, that he did compare them. I mean, this is factual argument. The district court found otherwise on all these points. The district court said, here's six different differences that should have been fairly obvious between this tread, you know, to an officer who's paying attention and not just sort of, you know, it's like a shoe that's less than 18 inches long. I think we have a match, you know, and the district court points out all these differences. We can't, we don't have jurisdiction to revisit that. So it seems like what you're arguing about is really just not germane to this appeal. No, but once it, well, that's the questions you're bringing before me. I mean, what Judge Ludington initially determined was that the entry was bad or unconstitutional. Let's talk a little bit about consent. Maybe that's worth talking a little bit about, because that would, if you're wrong about consent, that's the end of the case too, right? Well, and that's, you know, the thrust of Judge Ludington's opinion is that all of the rest of what we're talking about is kind of fruit from the poisonous tree, because the entry was bad where they found the shoes where they arrested him. Right, so now that means it's your time to argue why there was consent. Why was there consent? And so, you know, what we talked to, so as I was referencing, I think that the video very clearly shows, the body cam of Officer Lautner very clearly shows that there's an implied consent through gesture, which is supported by United States v. Carter. But what's the actual gesture in this case? In that circumstance. I agree with you. I mean, I'm not sure I'd call it implied consent, because if you wave someone in, it's not implied. That's just a symbol as opposed to something audible. So we know there was nothing audible about come on in, and so what's the gesture, whether implied or not, that is saying come in? I think that he continues the conversation with them. They ask him where his bike is. He's engaged in a conversation, and he continues that conversation as they enter the home directly behind him at the time. I believe it's very clear he's well aware. Continuing to talk to law enforcement, why does that show you've consented? Again, it's showing that he's aware that they are physically behind him, and they're engaged in the conversation. Another panel of this court had a case up that is extremely similar to these circumstances that they decided on brief. It was up for today, but they did decide it on brief, and that was the matter of Cook v. Boss, and Thapar, Navalbandian, and Ritz made the determination that the ongoing communications as they walked in and walked back, I'm sorry, as she opened the door, she never explicitly said come in. How long was that conversation? This one was very brief, which also lends itself to no consent, but keep going. This one was very brief as well, but another piece that's very important is that there was what I would call a continuation of the consent, a confirmation of the consent, retroactive consent in this matter, where they subsequently say, can we come upstairs? They're at the threshold. They say, can we come upstairs? She says, yeah, I don't care. And so they go upstairs, and they further find the evidence. Now, in this circumstance, what's very important is once Mr. Little was in handcuffs, they said, do you have some ID, David? He says, yeah, it's in the top drawer. My officer says, is that okay if I go in there and get it? Again, all in the record, and he says yes. That's a way that the consent was confirmed or ongoing, shows a sign of retroactivity of the original implicated implied consent. Does that mean he already enters? That is. Okay, well, I mean, at that point, he's already there. I mean, he's also in handcuffs, and he's been arrested. Yeah. And again, but we're also, I mean, so far what we're ignoring here is that when I deposed Mr. Little, his testimony was, I admit, I let them in. Well, that could mean all kinds of things. He also had a mental health disability, right? I mean, I don't think anyone would call it a mental health disability. He does have a lower than average IQ. I don't believe that it puts him at a disabled level, but it's very clear from the video that he is well aware of the communications that he is having with my officers. He in no way shows that he is misunderstanding their conversations at all. So to the extent that was injected by the judge, I don't see that as relevant. It cuts both ways. You know, I mean, we have the video of the encounter, and if he says I let them in, I mean, it might just as well mean he didn't kind of affirmatively prevent them from walking right in, which is what the guy seemed to do. And that's, I mean, you referenced Scott V. Harris, that's, you know, there was another case up before this panel today, and you decided to decide it on the briefs. You issued the brief by chief judge for publication where you did reference we can't ignore something that is, or we can't allow an assertion which is the pleading that, yes, it was, I didn't give him consent when it's blatantly contradicted by the record, but here I have a deposition of the man saying I let them in. You would say the film, the body cam blatantly contradicts? You think that the film is the thing that we talk about when it comes to Scott V. Harris, not later testimony, right? That's the whole point. We can watch it with our own eyes, so we don't need the district court's consent. When you're looking at a video that in any way, I mean, unless it specifically showed a lack of consent, which would be you are not welcome in my home, what are you doing here, get out, that is later contradicted by testimony that says, yeah, I let him in. We'll give you a full rebuttal and we'll hear from your friend on the other side. Thank you very much. You can sit down. Okay, so is it Mr. Desmond? Can you hear us? Yes, your honor. Can you hear me? First of all, I want to thank the panel today for accommodating my late request for a virtual argument. I was unfortunately diagnosed on Sunday with COVID, which kind of threw a little bit of a wrench in my plan. So thank you to the court for that. A lot of people in the room are thanking you for telling us, so thank you. You're welcome. Your honor, I want to start with the issue of jurisdiction very quickly. This court, in a case that I argued actually in December, just issued an opinion in January. It's a published opinion entitled Miller v. Green-Hernandez that talks about the impropriety of making factual challenges to the record in a qualified immunity appeal when that's an interlocutory appeal. And I think that we've heard an extensive amount of that already, just like we saw an extensive amount of that in the briefing. What's your take on the point that came up earlier about whether the officers knew the skin color of the assailant? Well, I'll tell you, your honor, one of us is very wrong. And I hope that it's not me, but I believe that that 9-1-1 call, that initial 9-1-1 call, the officers were aware that the alleged perpetrator was supposedly black. I believe Judge Ludington references that in his opinion. I'm not certain. The one fact that I'm a little less certain on is I know that when Officer Lautner goes to the law firm, he engages in a conversation with the eyewitness, a very brief conversation that he recounts in his police report where the eyewitness is yelling to him while he's at the law firm. I'm not sure if that conversation disclosed to Lautner that the assailant was black, but my understanding is that these two officers were well aware that the suspect was reported to be a black man that was wearing either gray or tan clothing. Okay. And then on consent, I guess I have my view of the, we look at the film. I mean, it's there. We have the body cam. Now, what do we do with the fact that later on he testifies that I let them in? What do we do with that fact? I don't think that that matters, frankly. I think that it doesn't matter for a variety of reasons. The case law cited in our brief that discusses consent talks about how whether consent was given has to be judged based on the facts at the time that they existed, not on later factual developments or additions to the record. As Judge Kethledge referenced, my client is someone who necessitates special education services. As counsel just admitted, he has a lower than average IQ. There are two cases cited to in my brief that I think make some things very clear here, and it's United States versus Worley and United States versus Worley. Can I just pause on that point? The officers wouldn't have known that at the door. That point about lower IQ would seem only to be relevant to the later testimony, but that wouldn't have anything to do with what actually happened at the door and whether, you know, he waves them in, right? I mean, that's the... Go ahead. Respectfully, Your Honor, I think this is another one of those instances where we butt into the factual findings made by Judge Ludington because what Judge Ludington's opinion makes clear, and this is based on his viewing of the video, he states that my client had an atypical intonation, and he cites the case law for this principle, that my client speaks with an atypical intonation that's indicative of someone who needs special education services. So he states in this record that it should have been evident to these officers that my client may not have understood the concepts of consent. What about the fact that the conversation continues... I mean, it happens so quickly. That's the part that helps you, that there's not consent. But the part that perhaps helps the officers is when he turns around, he does continue the conversation. So I would agree. I don't think there's any gesture of, you know, coming in. I would agree with that. But, you know, I don't understand what this has to do with deference to district court judges if the question is, what does it mean when you continue a conversation as you have your back to the officers? Does that signify come on in? So to me, you're not going to help yourself by talking about what Judge Ludington found. This is a law point about consent. So help me out. What do we do with the fact that he did keep the conversation going? Well, he kept the conversation going while he is in a, parties all agree, a very small one-bedroom apartment. So this isn't a situation where he's wandered three rooms away from the front door and it sort of necessarily implies that if you want to continue to talk to me, you need to follow me in. He is mere feet away from the officers while he's talking. Also, they follow him into the home immediately. It's not as if they're waiting for a few seconds to see, oh, he's continuing this conversation while he's moving far away from me. They follow him immediately. What United States v. Shekels tells us is that consent has to be clearly given. It has to be unequivocal. There has to be no question about the fact that the individual intended for the officer to be able to come into their home. Respectfully, Your Honors, the presumption or the burden of proof, I should say, the burden of proof on this point is on the defense. And I don't even mean because they're the appellant. I mean under our controlling case law, when a governmental defendant wants to argue that there was consent given, the burden of proof is on them to show by a preponderance of evidence. And these officers, if they wanted to ensure that there was consent, all they had to do was simply say, Mr. Little, may we come in? They had been having a conversation with him. They had been talking to him. And so where they've allegedly received training on these issues, they know what kind of consent that they need and what kind of evidence of consent they need in order to be able to survive Fourth Amendment scrutiny. And they simply don't have it here, Your Honor. Can I switch to the probable cause analysis, if you don't mind? And I actually want to talk less about probable cause and more about qualified immunity. Wesby and a lot of other Supreme Court cases say with respect to Fourth Amendment questions, because they're so fact intensive, especially probable cause, you need to cite an analogous case. That seems to me perhaps the weakest part of your argument, that I'm not certain. Maybe it's because the facts are so unusual here, but I'm not certain you have cited a fact pattern that is analogous in which we or other circuits or the Supreme Court have said there is a lack of probable cause on the facts here about shoe prints in the snow leading to a home. You're correct, Your Honor. First of all, regarding the level of specificity that's required, I agree that a lot of the case law that talks about the specificity requirement in a qualified immunity analysis, a lot of it is derived from Fourth Amendment case law. But I'd submit that the majority of it comes from excessive force case law. If we look at the Mullinex decision from the U.S. Supreme Court, they talk about how excessive force and uses of excessive force under the Fourth Amendment are very fact intensive analyses. I think the case law, and this goes back really to Welsh v. Wisconsin, which we cite to in our brief, and really in fairness to the Court, it goes back to the very founding document of our nation. The protection of the home is the thing that is of most paramount importance under the Fourth Amendment. And so when we're talking about officers entering a home or officers placing someone under arrest, it's very clear that you need to have probable cause in order to be able to do so. And probable cause law may not have something that's based on what I think is a clear, clear misidentification of shoe prints. And frankly, and you know, Judge Murphy, this is where it gets a little frustrating because there's not even a matching of the shoe prints that happens at the time that the arrest occurs. All they do is follow shoe prints to my client's home and have a conversation with him. Why isn't that enough? I mean, let's say there's no shoes drying. The shoes aren't drying. And they just have the tracks and the bike track leading to the home. What authority would make clear to the officers that that does not provide probable cause to think that the perpetrator is inside? Especially when you have a single individual as opposed to more than one person. Tracks from the scene of the crime, fresh snow, two residents, one person there. What makes it clear to these officers that they don't have probable cause? So first of all, Your Honor, I think one of the primary problems for these officers is there is nothing in this record that indicates that the tracks that they are following have anything to do with the individual who was breaking windows at these two properties. Recall, there were two different properties that had their windows broken. There wasn't a clear line of tracks that led from property A, the law firm, to property B, which was the medical building owned by Central Michigan University, and then to property C, which was my client's home. There are shoe prints outside of one. There are allegedly, and this is only according to Officer Lochner, because Officer LaDuce was not at both scenes, there were allegedly similar shoe prints outside of the law firm, as there were to outside of the medical building, and then they picked up a trail that they followed to my client's home. But even if those shoe prints did match my client's shoes, which they don't, there's no indication that those shoe prints have any connection to a criminal activity that's occurring at those buildings. And so I think that there are very foundational factual problems for the officers. So just let me stop you. So I asked a legal question, what would put them on notice? That's qualified immunity, clearly established law, and you keep responding with the facts. And so I take it your theory for why there was a violation of clearly established law here is that it was just such an obvious or egregious violation that any officer would know? Because I do think that the court has, like, two components, either a case directly on point or a fact pattern beyond the pale. And you haven't identified a case directly on point, so I assume that your theory for why you overcome clearly established law is just facts beyond the pale here of thinking there was probable cause? I think when we compare what we're looking at here with the probable cause standard that's set forth, for example, in Beck v. Ohio, where it talks about all the known facts and circumstances to an officer, would they lead a reasonable officer to conclude that that person either had or was in the process of committing a criminal offense? There's nothing here that would cause a reasonable officer to draw that conclusion. And so I don't think that this is an instance where we need to say, well, look at this other case where there were shoe prints that matched nothing and that weren't attributable to an eyewitness saying these shoe prints belonged to the assailant and then they marched to this house. I don't have that case, but I don't think you need that case when you look at broad principles of what probable cause is. Okay. Thank you for that. You're welcome. All right. Counsel, I think we understand your arguments. Unless you have anything indispensable to tell us, I think we've heard what we need to hear. I don't, Your Honors. Thank you very much for your time today. And again, thank you for your accommodation. All right. Thank you. We'll hear rebuttal. Just briefly, if we look at Judge Ludington's original opinion on the motion for summary judgment at ECF 55, page ID number 724, he simply makes the statement that notably the person that called 911 noted that the individual was a black male wearing a tan coat. It doesn't in any way make the factual determination that my officers were aware, and I have nowhere in the record that shows that. So I just wanted to make... So Officer Lautner was deposed and was asked the question. I don't know necessarily the whole context, but you had a chance to interview at least one caller. I think by interview, I thought that meant at the time, but maybe I'm mistaken. Interview at least one caller, we know that, and that was the person who, at least as you can recall, described hearing the crash and described a black male in a tan coat with a hat going towards Washington, right? Yes. Sure, and so the way that Saginaw operates, we have the Saginaw County 911, and so the 911 calls are made into Saginaw County. Any of that investigation would have been well after the fact is my understanding. Okay, so the broader context, but if there's a dispute of fact on this, then we have to interpret the facts in the light most favorable to the other side, right? I don't think that... Whether he knew, we have to assume that he did know. I don't think there's anything that shows that he was aware that he... Okay, so you don't think that question showed that he might have interviewed him at the time and learned this fact? No. But the other thing, so what I wanted to reference as well is, so as Judge Murphy noted, in the case that you published less than two weeks ago, Moore v. Oakland County, from the chief judge, you did reference in a qualified immunity analysis the claimant must identify a case with facts similar enough that it squarely governs this one so much that it would bind a panel of this court. And I think they've admitted they don't. And so then we get simply to this issue of whether the facts are simply beyond the pale. Again, we have a police report with a track comparing the track to the shoe. We have both of my officers... But facts are not very helpful if they don't connect the three relevant addresses. We have both of my officers' testimony that say that they did believe that the tracks were correct and that they believed very specifically based on following the shoe prints and subsequently comparing them that it established probable cause. That's in Steve Lautner's testimony. And so regardless, I do think that they're absolutely covered by qualified immunity. Additionally, there was the reference to the atypical intonation. This is something that is kind of present throughout the opinion in multiple places where the judge did decide to make that factual judgment, but it was never actually briefed by either party or argued by either party. Okay. Thank you very much. Thank you, judges. Thanks to both of you for your helpful briefs and helpful oral arguments. We appreciate it. The case will be submitted.